RECEIVED

SEP 2 8 2018

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

DUNKIN' DONUTS FRANCHISING LLC,
*et al.*,

    Plaintiffs,

v.

C3WAIN INC., *et al.*,

    Defendants.

Civil Action No.: 13-cv-6865 (PGS)(DEA)

**MEMORANDUM AND FINAL**
**JUDGMENT**

## SHERIDAN, District Judge

This matter returns to the Court after granting, in part, Plaintiff Dunkin' Donuts Franchising LLC's (hereinafter, "Dunkin") motion for summary judgment on January 14, 2016. As such, a two day bench trial was conducted. The Court has original subject matter jurisdiction over this action pursuant to Sections 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116(a) and 1121, and 28 U.S.C. §§ 1331, 1332(a), 1338, and 1367(a). Both parties agree that the Franchise Agreements are governed by Massachusetts law, based on the choice of law provisions contained in each agreement. Under Massachusetts law, Plaintiffs bear the burden of proof by a preponderance of the evidence, that Defendants breached their contractual obligation under the franchise agreements. Here, Plaintiffs assert that because Defendants committed fraud, Plaintiffs' burden of proof need "not be shown by anything more than the ordinary preponderance of the evidence standard applicable to civil cases in general." *Compagnie de Reassurance D'Ile De France v. New England Reinsurance Corp.*, 57 F.3d 56, 72 (1st Cir. 1995) (applying Massachusetts law).

1

According to the Freehold Mall franchise agreement, confidential information "means information relating to us . . . that is not generally available to the public, including manuals, recipes, products, or other trade secrets and all other information and know-how relating to methods of developing, operating, and marketing the restaurant . . ." (Ex. P1, §10.5). Dunkin maintained that the couple traded confidential marketing information which violates non-disclosure clauses of the franchise agreements during this pillow talk. For example, Jack Laudermilk, Esq., in-house counsel for Dunkin, testified at a deposition that "pillow talk is pillow talk, and we don't know its not happening." (Dep. Tr. 191:2-6).[1]

Over the course of the trial, Dunkin eased up on the pillow talk theory, and focused on other more concrete facts. On a motion for summary judgment, Dunkin presented undisputed evidence of Moothedath's interest in the Red Mango shop by demonstrating, among other things, a personal guarantee on a joint loan ($250,000) to Moothedath's and Raji's corporations (CWAIN and Greensphere) for improvements to the Red Mango and the combination shop at the Freehold Mall. Summary judgment was granted against Moothedath's other corporation (C3WAIN, Inc.) on the Freehold Mall Franchise but denied with regard to Moothedath's other franchises held by CWAIN because the corporate entity was different.

Here, Dunkin seeks to terminate the other two viable ongoing franchises, Wilson Avenue and Gordon's Corner because the principal shareholder, Moothedath, fraudulently misrepresented facts about the Freehold Mall franchise. Interestingly, on its face, Dunkin appears to be concerned with the covenant not to compete; but its application is different: it seeks to terminate the other franchises due to Moothedath's fraudulent statements with regard to the Freehold Mall location.

---

[1] Obviously, this statement is not very helpful to Dunkin who bears the burden of proving "pillow talk".

Baskin-Robbins Franchising LLC is engaged in the business of creating and developing Baskin-Robbins franchises throughout the United States. (Pls' PFFCL at ¶ 8; Tr. 70:6-13). Plaintiff BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins," and related marks. (Pls' PFFCL at ¶ 9; Stipulation of Facts at ¶ 3f). Baskin-Robbins is authorized to use the marks owned by BR IP Holder LLC and to sublicense the use of these marks to franchisees. (PFFCL at ¶ 10).

Defendant Moothedath is a New Jersey citizen and the president and sole shareholder of C3WAIN Inc. and CWAIN Inc. (Stipulation of Facts at ¶ 3d). Specifically, C3WAIN Inc. is a New Jersey corporation that owned and operated a Dunkin' Donuts and Baskin-Robbins combination shop located in the Freehold Raceway Mall in Freehold, New Jersey. (Stipulation of Facts at ¶ 3c). Defendant CWAIN Inc. is a New Jersey corporation that currently owns and operates a Dunkin' Donuts and Baskin-Robbins combination shop located at 26 Wilson Avenue, Manalapan, New Jersey; and a Dunkin' Donuts shop located at 285 Gordons Corner Road, Manalapan, New Jersey. (Stipulation of Facts at ¶¶ 3a, 3b). Since 2005, Moothedath has been a Dunkin franchisee and still currently owns and operates the two shops in Manalapan, New Jersey. (Tr. 17:6-8).

Defendant Moothedath and his wife, Raji, were both born in India and immigrated to the United States over thirty years ago. According to Moothedath, he and his wife have pursued prosperity through education and hard work. (Tr. 401:13-25). They have been married for thirty years and have three daughters. (Tr. 402:2-3; 408:10-11). Moothedath holds a bachelor's degree in engineering and a Master's in Business Administration from Villanova University. (Tr. 16:14-17; 17:12-13). Raji earned a Master's degree in industrial psychology from Kean University. (Tr. 401:18-20).

Prior to becoming a Dunkin franchisee, Moothedath practiced as a staff engineer for T&M Associates, an engineering firm, where he designed roadways and highways. (Tr. 17:12-20). While at T&M, personal computers were being introduced into the market and Moothedath became familiar with the operation of such computers, so he trained other engineers on their use. (Tr. 17:15-20). Seeing personal computers as a new business opportunity, in 1988, the Ramachandrans started a computer company named Bits-N-Bytes. One of its primary customers was the State of New Jersey, to which Bits-N-Bytes supplied and installed new computers for schools across the State. (Tr. 18:5-19; 239:22-240:4). While Bits-N-Bytes initially flourished, by the mid-2000s, sales tapered off as competition intensified; and the State outsourced such contracts with other vendors. (Tr. 407:21-408:5). Recognizing that the computer business had reached its peak, Moothedath began investigating new business ventures in which to invest. (Tr. 19:21-25). Eventually, he focused on opening a Dunkin Donuts store.

Over the next decade, Moothedath would enter three separate franchise agreements with Dunkin. On June 20, 2005, Moothedath, on behalf of CWAIN, executed a Franchise Agreement for the operation of a Dunkin' Donuts shop located at 285 Gordons Corner Road, Manalapan, New Jersey (hereinafter, the "Gordons Corner Franchise Agreement"). (Stipulation of Facts at ¶ 3a; Ex. P3). The following year, July 25, 2006, CWAIN, again through Moothedath, entered a second Franchise Agreement for the operation of a Dunkin' Donuts and Baskin-Robbins combination shop located at 26 Wilson Avenue, Manalapan, New Jersey (hereinafter, the "Wilson Avenue Agreement"). (Stipulation of Facts at ¶ 3b; Ex. P2). Finally, on November 14, 2012, C3WAIN, by and through Moothedath, executed a third Franchise Agreement for the operation of a Dunkin' Donuts and Baskin-Robbins combination shop located in the Freehold Raceway Mall, Freehold, New Jersey (hereinafter, the "Freehold Mall Agreement"). (Stipulation of Facts at ¶ 3c; Ex. P1).

6

As noted in Section I, all three agreements contained covenants against competition, which prohibited any franchisor from "own[ing], maintain[ing], engag[ing] in, be[ing] employed by, or hav[ing] any interest in any business which sells or offers to sell the *same or substantially similar products* to the type" offered by Dunkin. (Ex. P1, § 10, P2, § 8.0.3; Ex. P3 § 8.0.3) (emphasis added).

Throughout Moothedath's ownership and operation of his Dunkin franchises, he exhibited a commitment towards improving and advancing his franchises. He regularly worked long hours and weekends; and Raji assisted Moothedath in promoting various special marketing events. (Tr. 31:12-13; 403:15-404:22). They organized community blood drives, Halloween and Christmas parties, and Easter Egg Hunts, to advance the Dunkin brand, sell coffee and build a relationship with the community. (Tr. 403:3-7). Moothedath explained that these events were tailored towards families and were intended to show "a goodwill standpoint" of Dunkin and his shops. (Tr. 236:22-237:3). By looking at the revenue, this commitment and hard work has been beneficial with annual sales of $1.3 million at the Gordon's Corner location and $1.1 million at the Wilson Avenue store. (Tr. 52:9-11; 56:8-12)[3]. Since both shops were prospering, Moothedath was pursuing a third shop, and coincidentally, Raji began looking for a new business to operate.

As noted above, beginning in 2008, business at Bits-N-Bytes began "slowing down quite a bit" and Raji found herself with more free time on her hands to pursue other business ventures. (Tr. 407:19-408:6). Initially, she considered opening franchises with Computer Geeks or Alpha Graphics. (Tr. 409:14-18). However, after visiting a frozen yogurt shop in Princeton, New Jersey with her daughters, Raji had, as she put it, an "a-ha moment" and found herself enamored with the

---

[3] Although the Wilson Avenue shop was a combination shop; the annual revenues were never allocated between Dunkin and Baskin.

7

idea of owning and operating a frozen yogurt franchise whose market was adolescents and young adult college students. (Tr. 408:7-25). Eventually, she became aware of Red Mango and decided to pursue a franchise with it, based upon its marketing message and business philosophy. (Tr. 409:3-13). Red Mango offers for sale, among other things, various frozen yogurt flavors; frozen Greek yogurt; frozen yogurt blended with various toppings; and various smoothie flavors. (Stipulation of Facts at ¶ 3h). However, despite Raji's interest, Moothedath had reservations about opening a Red Mango franchise, due to the volatility of such "health fad" businesses. (Tr. 410:11-23).

In any event, on May 10, 2011, Raji, on behalf of Greensphere, executed a franchise agreement for the operation of a Red Mango frozen yogurt and smoothies franchise; and Moothedath on behalf of C3WAIN signed the Freehold Mall franchise agreement. (Stipulation of Facts at ¶ 3g; Ex. P10). As described below, Red Mango and the Freehold Mall Dunkin initially negotiated to occupy a single block of space at the Freehold Mall, and then subdivided the space for their respective needs. Subsequent to signing the franchise agreement, Raji transferred control of the Red Mango franchise to Greensphere Inc.,[4] of which she is the sole owner. (*Id.*).

After acquiring the franchise, Raji, along with a real estate agent assigned to her by Red Mango, began considering various locations for the new franchise. (Tr. 411:16-412:5). According to Raji, she considered a lease in Princeton, New Jersey before "this whole Freehold Raceway Mall came about." (Tr. 412:11-16). Raji did not choose the Freehold Mall location by herself; rather, Moothedath coaxed her into leasing space in Freehold Mall, since it offered a unit of space that could accommodate both Moothedath's Dunkin franchise and Raji's Red Mango at a cost

---

[4] Originally, Greensphere filed a certification of trade name with the Court Clerk of Monmouth County with the purpose of entering the recycling business (Ex. D13); but since the recycling business never occurred, Raji changed its purpose to operate a Red Mango franchise.

effective rental rate. (Tr. 417:13-418:1). The unit would be split, with the Dunkin franchise acquiring the larger share. (Tr. 271:18-272:10). In describing negotiations between the mall representative and the two franchises, Raji described it as "joint," explaining that the mall had questions for both Moothedath and Raji concerning issues of how the space would be split between the two franchises. (Tr. 420:14-421:6).

On March 20, 2012, almost a year after Raji acquired the Red Mango franchise, Moothedath emailed Bridget Gilbertsen, Freehold Mall's leasing agent, about different units available in the Freehold Mall. (Ex. P5 at 2). Copied on this email was Alan Persico, a Development Manager for Dunkin Brands, and two other Dunkin officials. (*Id.*). In this email Moothedath discussed the advantages of the two unit locations, which "would give this 'Youthtopia' Dunkin / Red Mango a different look and feel and not a 'run of the mill' store. Dunkin and Red Mango being good, strong national brands would bring a lot of value to the mall and vice versa." (*Id.*).

The following day, Persico responded to Moothedath's email, expressing concern about Moothedath's potential interest in a Red Mango franchise:

Rama,

Why no Baskin Robbins at the mall if you are interested in space? Do you own any Red Mango stores currently? You can not [sic] be approved to develop a Red Mango with Dunkin' Donuts at the mall.

(Ex. P5 at 2).

In response to Persico's inquiry, Moothedath claimed, "No, I am not developing any Red Mango stores nor do I have franchise agreement with them." (*Id.*).

In a subsequent email to Persico, and two other Dunkin officials, Moothedath again disclaimed any interest or affiliation with Red Mango:

[P]lease be informed that I DO NOT HAVE A RED MANGO. I am not a franchise[e] of that company, own any stores, nor do I have an agreement to develop any stores for them. They ([R]ed Mango) would be like any other store in the mall like a Star Bucks [sic], Gloria jeans or the local bagel store. I have no financial interest in a Red mango therefore, it is indeed not a factor to be concerned about.

(Ex. P6).

In any event, Bridget Gilbertsen (whose deposition testimony was read into the record), discussed Moothedath's involvement in acquiring unit space at the Freehold Mall. In 2012, Gilbertsen was a senior manager for Macerich, where she was responsible for leasing space for shopping centers, including the Freehold Mall. (Tr. 201:5-23). As lease manager for the Freehold Mall, Gilbertsen negotiated the leases for both Dunkin and Red Mango. (Tr. 202:14-203:6; 206:8-14). According to Gilbertsen, prior to ever discussing the opening of a Dunkin' Donuts franchise at the Freehold Mall, Moothedath contacted her about leasing a space in the mall for a Red Mango store. (Tr. 207:14-208:11). Gilbertsen explained that she only dealt with Moothedath, when discussing the Dunkin lease; but communicated with both Moothedath and Raji with regard to the Red Mango. (Tr. 205:2-7; 206:8-14). Similarly, when the parties were preparing the final letters of intent for the lease-space at the Freehold Mall, Gilbertsen explained that both Moothedath and Raji participated in negotiating the details of the lease. (Tr. 212:11-13). When asked to describe Moothedath's role in negotiating the Red Mango lease, Gilbertsen explained that he was involved in discussing how the unit space would be split between the two stores and that he was copied on Red Mango-related e-mails. (Tr. 213:1-16). Additionally, at Red Mango's Letter of Intent stage, Gilbertsen described Moothedath as "the primary or dominant person in the conversations." (Tr. 213:1-16).

On October 11, 2012, Greensphere Inc. entered into a lease with the Freehold Raceway Mall for the Red Mango franchise; that same day, C3WAIN Inc. entered into a lease with the mall

for a Dunkin' Donuts and Baskin-Robbins combination shop. (Stipulation of Facts at ¶¶ 3j, 3k; Ex. P11, P12). Moothedath personally guaranteed Greensphere Inc.'s lease, on behalf of Red Mango, with the mall, making him personally liable for Greensphere Inc.'s obligations. (Stipulation of Facts at ¶ 3l; Ex. P11 at 62).

The following month, November 30, 2012, Greensphere Inc. and CWAIN Inc. jointly obtained a $250,000 loan from Amboy Bank, the proceeds of which were deposited into CWAIN Inc.'s account. (Stipulation of Facts at ¶¶ 3m, 3n; Exs. P13, P14). Moothedath personally guaranteed the loan and pledged as collateral the lease of the Gordons Corner Shop. (Stipulation of Facts at ¶¶ 3p, 3q; Exs. P18, P19). Under the terms of the security agreement, should Moothedath default on his payment obligations,

> [Amboy Bank] shall be entitled to enter upon and take possession of the lease – hold interest in the Mortgaged Property . . . , and collect and receive all rent, issues and profits arising from the Mortgaged Property, including the rents, issues and profits then due and unpaid to [Moothedath], and also those thereafter to fall due.

(Ex. P19 at ¶ 10). After acquiring the loan from Amboy Bank, CWAIN Inc. transferred $150,000 to Greensphere Inc., which used the funds to construct the Red Mango franchise at the Freehold Mall. (Stipulation of Facts at ¶ 3o). Each month, Greensphere Inc. pays its share of the loan to CWAIN, which then pays the full monthly amount to Amboy Bank. (Tr. 36:23-37:12). As such, given Moothedath's personal guarantee of both Greensphere's lease with the Freehold Mall and the parties' joint loan with Amboy bank, Moothedath had a financial interest in Red Mango's operations. (Stipulation of Facts at ¶ 31; Ex. P11 at 62; Tr. 277:3-10).

Since all three Dunkin Franchise Agreements have terms prohibiting franchisees from having any interest in any business that sells the same or substantially similar products as Dunkin and Baskin-Robbins products, Defendants argued that the Red Mango and the Freehold Mall combination shop were not competitors, and therefore the covenant not to complete was not

violated. As such, a significant portion of the trial was devoted towards discussing the similarities and differences between Red Mango and Baskin-Robbins products. (Ex. P1, § 10; Ex. P2, § 8.0.3; Ex. P3, § 8.0.3). Specifically, Section 10 of the Freehold Mall Franchise Agreement concerns "restrictive covenants" that provide covenants against competition:

> 10.1 During the term of this Agreement, neither you nor any shareholder, member, partner, officer, director of guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may have a direct or indirect interest in, perform any activities for, provide any assistance to, sell any approved products to, or receive any financial or other benefit from any business or venture that sells products that are the same or substantially similar to those sold in Dunkin' Donuts or Basin-Robbins restaurants . . .

*See also* Ex. P2 and Ex. P3 at §§ 8.0, 8.0.3. (emphasis added).

Interestingly, Dunkin seeks to apply Moothedath's fraudulent statements about his interest in the Red Mango, as opposed to the substance of the above provision, because the cross-default provisions are limited to fraud. More precisely, the Gordon's Corner shop's[5] covenant not to compete was not breached by the activities that violated other Dunkin non-compete clauses. Accordingly, Dunkin seeks relief under the Freehold Mall agreement based on fraud.

The Freehold Mall Agreement includes a "cross-default" and fraud provisions. Section 14, entitled "Default and Remedies" provides:

> 14.0.1 You breach an obligation under this Agreement, or an obligation under another agreement, which agreement is necessary to the operation of the Restaurant.

* * *

> 14.0.4 You or your owners commit a fraud upon us or a third party relating to a business franchised or licensed by us.

---

[5] This Dunkin sells only Dunkin products.

* * *

> 14.0.6. We terminate any other franchise agreement with you or any
> affiliated entity by reason of a default under sections 14.0.3, 14.0.4
> or 14.0.5.

Relying on Section 10.1, Dunkin asserts that Moothedath violated the Freehold Mall

Agreement since he had an interest in Raji's Red Mango, which allegedly sells similar products to

that of Baskin-Robbins. In addition, by failing to disclose same to Dunkin, Moothedath defrauded

Dunkin in violation of Section 14.0.4 having "commit[ed] a fraud upon [Dunkin] with respect to

Freehold Mall franchise acquisition. As noted above, the Agreements also have "cross-default"

provisions. That is, if you are in default on the Freehold Mall franchise agreement by an act of

fraud, then the franchisee is in default in all of the other franchise agreements. (Ex. P1, § 14.0.6)

According to Dunkin, given that the two companies (Red Mango and the Freehold Mall

combination shop) are both in the "frozen dessert" business and offer frozen yogurt, the two are

deemed to sell the same or substantially similar products. Kathryn Thomas, Vice-President and

Managing Counsel for Dunkin' Brands, testified from a lawyer's perspective regarding these two

franchises.[6] Thomas testified to the general legal and business practices of Dunkin. Thomas, a

lawyer, testified about the language within the non-compete provision. To Thomas, both Baskin-

Robbins and Red Mango sold frozen yogurt with the same types of toppings. As such, the products

were the same or similar.[7] She explained that, under the terms of the Baskin-Robbins franchise

---

[6] Thomas was not involved with the Freehold Mall franchise transaction and had little personal
knowledge of the facts surrounding Moothedath's negotiations and acquisition of the Freehold
Mall location.

[7] Prior to trial, there was a Daubert motion brought by Dunkin's counsel seeking to exclude the
testimony of Jack A. Gordon, a financial forensics analyst. His opinion was that the Red Mango
and Baskin Robbins were not similar; but his qualifications did not meet the standard set forth in

13

agreement, the parties understood the fact that Baskin-Robbins is in the ice cream and yogurt business. (Tr. 73:16-21). Notably, under the Wilson Avenue Franchise Agreement, Thomas testified that Baskin-Robbins is in the business of providing "ice cream, yogurt, and novelties." (Ex. P2 at 2). Additionally, under the "Terms and Conditions" for a Baskin-Robbins franchise, the Agreement defines "Baskin-Robbins Products" as:

> [I]ce cream, ice milk, sherbets, water ices, *yogurts, frozen desserts*, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds of flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Baskin-Robbins Proprietary Marks.

> (*Id.* at 20) (emphasis added).

Oddly, Thomas testified that the management of Dunkin maintained an "internal policy" that identified what products are the same or substantially similar, (Tr. 80:12-16; Ex. P31); however, the policy is a written policy distributed to Dunkin management but not to franchisees like Moothedath. The internal policy states, "Baskin-Robbins is an ice cream and frozen treats chain, and we do not permit into the Baskin-Robbins System someone who has an interest in any ice cream or frozen treats retail business." (Ex. P31 at 2). The policy provides examples of what it considers "competition":

* Ice Cream Concepts (hard or soft) including Ben & Jerry's, Haagen Daz, Friendly's, Brigham's, Carvel, Dairy Queen, Swenson's

* Yogurt Concepts including TCBY Treats.

* Smoothie Concepts including Planet Smoothie.

(*Id.*).

---

F.R.E. 702. Although Thomas as a lawyer does not have business experience to determine whether Red Mango and Baskin Robbins compete; she was qualified to explain the non-compete provision.

As the trier of fact, it seemed peculiar that such definitive information was developed into a policy for Dunkin executives, but was not shared with franchisees. If the policy had been given to the franchisee, the franchisee's knowledge of what Dunkin considered "same or substantially similar products" would have been more apparent. In addition, the policy also notes that there are exceptions to the enforcement of the same or substantially similar products prohibition, and it recognizes some of its franchisees own other franchises which may sell the same or substantially similar products, that is:

> B. It is not our intention to preclude an operator of another restaurant or concept simply because it competes for the same day-part dollars as one or more Dunkin' Brands franchises. <u>In a multi-brand world, this would preclude the vast majority of existing operators. Accordingly, our policy does not preclude, for example, a Burger King franchisee from purchasing a Dunkin' Donuts franchise simply because Burger King competes in the morning and sells coffee and breakfast sandwiches.</u>

> C. If the prospect seeks to develop . . . a Dunkin' Brands combo, the test is whether the prospect/franchisee has an interest in a business that is a competitor any of the Dunkin' Brands franchises to be operated. (emphasis added).

Obviously, the underscored language discredits Ms. Thomas' testimony wherein she asserted that no franchise should have "divided loyalties" by selling the same or similar products. (Tr. 120:1-20). Moreover, Ms. Thomas conceded that "its okay to have an interest in a company which sells a small amount of the same or similar business." (Tr. 142:1-7). Also, the internal policy sets forth an alternative remedy other than termination, if the franchisee is selling competing products. The policy requires "any individual who has a financial interest that would violate Dunkin's Brand policy must divest his interest in the competing brand" or "convert the competing use" to a Dunkin brand. It states:

5.    Avenues of Resolution — Divest or Convert

> In order to be approved into the Dunkin' Brands system or to grow or retrofit to add brands, any individual who has a financial interest that would violate Dunkin' Brands policy must divest his interest in the competing brand(s) by transferring of the business in a documented arms-length transaction (no transfers to relatives) or, in limited circumstances approved in advance in writing by Dunkin' Brands, must alternatively convert the competing use to the Dunkin' Brands brand.

There was no testimony that Dunkin allowed Moothedath to "sell a small amount" of frozen desserts or allowed him to "divest" his interest in the Red Mango.

In any event, Thomas discussed why Dunkin considers Red Mango products to be the same or substantially similar to Baskin-Robbins. She explained, "[v]irtually everything [Red Mango] sell[s] we sell . . . they are a purveyor of frozen treats, they are a frozen dessert brand like Baskin-Robbins; they sell frozen yogurt, they sell parfaits, they sell smoothies, they offer toppings just like Baskin-Robbins." (Tr. 91:3-10). Thomas noted that both companies offer the same smoothies and "nearly the same kind of toppings ranging from gummy bears to brownie bites to M&Ms." (Tr. 92:6-14). Additionally, in response to the growing trend towards frozen yogurt products, Thomas explained that Baskin-Robbins launched a new initiative, "BRight Choices," in 2009. (Tr. 92:6-93:3). The BRight Choices platform emphasizes the healthier items available at Baskin-Robbins, such as fat free frozen yogurt and Greek yogurt, as well as no-sugar-added ice creams. (Tr. 92:15-93:3, 511:6-512:18). The initiative has been in effect since 2009, and Baskin-Robbins has required its franchisees to carry at least three BRight Choice products. (Tr. 512:24-513:10).

Moothedath and Raji, had a more practical view of what the non-compete clause meant. First, Moothedath testified that some of the products overlap, but the business models of Dunkin and Red Mango are completely different. Moothedath was adamant that the Red Mango products

16

were not the same or substantially similar to Baskin Robbins.[8]  According to Moothedath, Baskin-Robbins is primarily focused on selling ice-cream and its products to many who are not health-oriented; whereas Red Mango products are geared to health concerns and younger people. (Tr. 289:23-290:20).  Although frozen yogurt is offered, Moothedath claims that in the "12 years that I've been in Baskin-Robbins, there was not one scoop of hard-packed yogurt that I sold." (Tr. 28:16-20).  He conceded that his shops may have offered four or five BRight Choice products; but he had never heard of the BRight Choice platform as a marketing scheme.  (Tr. 291:6-9; 343:13-15).  Despite that Red Mango and Dunkin/Baskin are both in the frozen dessert business, Moothedath claimed that his Dunkin combination shop and the neighboring Red Mango shop could financially coexist, since Red Mango had a specialized market which sold to health-conscious patrons and Dunkin/Baskin sold to patrons who were less nutrition oriented.  He explained:

> It's been a hundred percent corroborated with my vision and what I thought based on my conversation with Red Mango throughout, that this as a health and fitness space, I mean why would I put my store next to them otherwise.

(Tr. 454:2-11).

Like Moothedath, Raji also testified that Red Mango is "totally different" from Baskin-Robbins. (Tr. 446:1-2).  According to Raji, Red Mango is focused on healthy frozen desserts and uses stevia, instead of sugar, in its smoothies. (Tr. 446:4-18).  Raji also noted that the two business have different business operations.  At Baskin-Robbins, orders are prepared over the counter; however, Red Mango employs a self-service business operation, where customers prepare their

---

[8]  During Moothedath's direct examination, he brought prepared notes to the stand and began reading them into the record. (Tr. 293:16-295:18).  These notes were later admitted into evidence as Exhibit D52, and are largely excerpts from the Baskin-Robbins' website.

own desserts. (Tr. 450:2-11). This being said, she did concede that many of the same toppings offered at Baskin-Robbins are also available at Red Mango, such as Oreo cookie bites, sprinkles, gummy bears, M&Ms, brownie bites, peanut butter cups, and chocolate syrup. (Tr. 485:9-486:16).

Defendant's brief claims that Dunkin was being selective in its enforcement of its anti-competition clause. Evidently, Dunkin allows Dunkin franchisees to have an interest in a Burger King which sells coffee and breakfast sandwiches, and Defendants point is that Red Mango is no different.

In any event, consistent with the Court's summary judgment decision, it is clear that both franchises sold frozen yogurt. From the testimony, Moothedath and Raji claimed the Dunkin/Baskin-Robbins business/marketing model is far different than the Red Mango model. That is probably true; however, this franchise agreement prohibits the sale of same or substantially similar products. Here, the products are the same. As such, this provision of the franchise agreement has been breached.

## VII. Termination of the Franchise Agreements

Based on Defendants' misrepresentation, regarding his interest in Red Mango, Dunkin sent Defendants a "Notice of Default and Termination" letter, terminating the Freehold Mall, Wilson Avenue, and Gordons Corner Franchise Agreements on October 10, 2013. (Ex. P7). The basis for termination was that Defendants breached the Franchise Agreements by "operating a Red Mango frozen yogurt franchise next door to your Dunkin' Donuts/Baskin-Robbins franchise . . . . This was done without [Dunkin's] knowledge or consent." (*Id.* at 2). The letter explained:

> You have committed fraud in connection with your franchises by: (1) intentionally misrepresenting your involvement with a competing business in order to induce [Dunkin's] approval of your Freehold Raceway Mall Franchise, and (2) continuing to conceal from [Dunkin] your interest in a competing business. Specifically, prior to entering into your Franchise Agreement for the Freehold Raceway Mall Franchise, you intentionally failed to disclose to [Dunkin] that a competing

business would be opening next to the proposed site of that franchise and your interest in that competing business. Further, after entering into the Franchise Agreement for Freehold Raceway Mall Franchise, you continued to conceal your interest in the competing business.

(*Id.*).

As such, Dunkin explained that these breaches constituted a default under Section 14 of the Freehold Mall Franchise Agreement and provided good cause for terminating the Freehold Mall franchise. (*Id.*). Finally, based on the cross-default provision in Section 14.06 of the Franchise Agreement, Dunkin also terminated the Wilson Ave and Gordon's Corner franchise.

Jack Laudermilk, whose deposition testimony was read into the record, explained the basis for deciding to terminate the Franchise Agreements. He explained that he reviewed the loss prevention report, which investigated the matter, and spoke with counsel before terminating the franchises. (Tr. 180:2-181:3). According to Laudermilk, there were no circumstances wherein a Baskin-Robbins franchisee, who also had an interest in a competitor, was permitted to cure the default. (Tr. 181:17-21). The reasoning, as Laudermilk explained, is that "it would [open] the gates for similar conduct," wherein franchisees would attempt to operate competing businesses, since there is not as great a deterrent. (Tr. 181:22-182:12). However, given that there are thousands of franchisees, oversight is unfeasible, which is why such a "rigid" policy is in place for those who default on their Agreement. (Tr. 182:6-12). Since Laudermilk did not appear at trial, he was not cross-examined on the internal policy of Dunkin. That policy shows some inconsistency in Laudermilk's testimony.

Despite receiving the notice of termination, Defendants continued to operate each of the franchises. (Tr. 42:13-43:2). However, consistent with the Court's summary judgment decision, and the Third Circuit's affirmation, in 2017, Defendants closed the Freehold Mall franchise, but continue to operate the two remaining shops and pay the required consulting franchise and

continuing advertising fees. (Stipulation of Facts at ¶ 3s; Tr. 56:13-23). Similarly, Raji sold her Red Mango franchise on September 29, 2017 for the approximate amount of $159,000. (Tr. 475:17). Despite selling both franchises at the Freehold Mall, the loan with Amboy Bank is still being repaid. (Tr. 437:22-24).

Lastly, based on Defendants' breach of the Franchise Agreements, Plaintiffs' seek for the Court to order their compliance with the Post-Termination Obligations set forth in the parties' Franchise Agreements. Section 9.4 of the Franchise Agreements, sets forth several requirements, should a franchisee be in default:

> 9.4.2 FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and
>
> 9.4.3 FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) . . . .
>
> 9.4.4 FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property).

(Ex. P2 and Ex. P3, §§ 9.4, 9.4.2, 9.4.3, 9.4.4). Based on the above, Plaintiffs request that Defendants cease use of Dunkin's proprietary marks, trade secrets, confidential information, manuals, and proprietary business methods. In addition, Plaintiffs seek that Defendants refrain from holding themselves out as Dunkin franchisees and return all operating manuals, plans, and other proprietary information relating to the operation of the franchises.

## CONCLUSIONS OF LAW

Generally, the Court is mindful that it has equitable powers to decide a case, (*Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 563 (3d Cir. 1985)); and that the New Jersey Legislature has deemed that there is a "disparity of bargaining power" between franchiser-franchisee relations. *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3d Cir. 1998) (citations omitted). At trial, Defendant's counsel requested that I reconsider my previously entered summary judgment decision based on new evidence presented about the internal policy of Dunkin about the interests in a competing business. As a matter of fairness, I reviewed that decision.

In the summary judgment decision, I found unmistakably that Moothedath had misrepresented to Dunkin representatives, on at least two occasions, that he had no interest in the Red Mango franchise. *See*, supra. at p. 6-7, *see also Dunkin Donuts Franchising, LLC v. C3WAIN, Inc.*, 677 F. App'x 779, 783 (3d Cir. 2017). If Moothedath had truthfully disclosed his or Raji's interest in the Red Mango, the issue could have been addressed; but Moothedath chose otherwise, leaving himself and Raji in this untenable situation. Since Dunkin was fraudulently induced into executing the Freehold Mall Franchise Agreement through Moothedath's misrepresentations, there is no reason to reassess that decision to terminate the franchise agreement of the Freehold Mall. Moothedath falsely induced Dunkin to enter the Freehold Mall Franchise and the franchise agreement provides for termination. The issue here is whether the court should enforce the no fraud provision and the cross-default provision to terminate the other two franchise agreements.[9]

On this issue, Dunkin coyly argues that the no-fraud provision triggers the cross-default provision, yielding Dunkin the right to immediately terminate the two other franchise agreements.

---

[9] It should be noted that Dunkin also seeks for the Court to find that Defendants committed trademark and trade dress infringement. However, there was little evidence presented during trial regarding same.

On its face, that remedy may actually be in accord with the terms of the Freehold Mall franchise agreement; but it is a harsh result. After all, the two franchises are controlled by a minority owned entrepreneur who arduously and diligently worked for their success! Although Dunkin is asserting the fraud provision, its chief complaint is about a violation of the covenant not to compete, and the law on such a provision should be considered.

Primarily, this case is about Moothedath's engagement in a competing business. The primary goal of contract interpretation is to enforce contracts as the parties intended. *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015) (quotations omitted). Further, a court must look at the contract as a whole. *Barco Urban Renewal Corp. v. Hous. Auth. of Atl. City*, 674 F.2d 1001, 1009 (3d Cir. 1982). A covenant not to compete is valid if it is reasonable in light of the facts of each case. *Boulanger v. Dunkin' Donuts, Inc.*, 815 N.E.2d 572 (2004). To determine reasonableness, the court reviews the legitimate business interests behind the covenant, including the protection of trade secrets and prohibition on the sale of a competitor's similar products. *Id.* at 578-80. When reviewing the Freehold Mall franchise agreement, and the legitimate business interests of Dunkin, I find that termination of the franchise agreements based on the covenant not to compete for Gordon's Corner and Wilson Avenue are unreasonable for the following reasons:

First, although trade secrets (described by Dunkin as "pillow talk") was initially raised, at trial, there was little or no substantial evidence that such discussions occurred. Dunkin submitted the deposition testimony of Jack Laudermilk, Esq. who was involved in Moothedath's breach of the non-compete clause. His testimony was unimpressive. He noted "pillow talk is pillow talk and we don't know it's not happening." (Tr. 191:2-6). The ambiguity of that statement by Laudermilk does not warrant rescinding the other two franchise agreements.

22

Second, with regard to the sale of similar products, there is no evidence of harm or injury to Dunkin. Granted, both Red Mango and Dunkin sell frozen yogurt at the Freehold Mall combination shop; but there is no evidence that the Red Mango impacted sales at the Gordon Corner and Wilson Avenue franchises. To enforce the franchise provisions against all three franchises when there is no proof of financial harm or injury to Dunkin is an untenable outcome.

Third, the only witness Dunkin produced at trial was Kathryn Thomas, Vice President and managing counsel for Dunkin Brands. She testified about the meaning and practice of Dunkin/Baskin non-compete clause, but she was not involved in the underlying facts set forth in the case. More particularly, she did not quantify the scope of any injury, or set forth why the covenant not to compete should be rigidly applied to defendant Moothedath, except to say that a franchisee should not have "divided loyalties." However, even that testimony is at odds with the internal policy. This undermines her credibility.

Fourth, Dunkin's internal policy undercuts Dunkin's rationale in this case. The internal policy recognizes that some franchisees may own other franchises that "compete for the same-day part dollars" because "in a multi-brand world, this would preclude the vast majority of existing operators.." (Ex. P-31). There was no evidence or justification presented why the internal policy is being strictly enforced against Mooothedath's corporations, but may be waived against others.

Fifth, the internal policy sets forth "avenues of resolution" if a franchisee breaches the covenant not to compete provision. That is, a franchisee "must divest his interest by transferring the business in a documented arm's length transaction or receive approval of Dunkin in limited circumstances (Ex. P-31). In this case, Moothedath has complied with one "avenue of resolution," since Raji testified she has sold the Red Mango franchise at the Freehold Mall. (Tr. 475:12-17). As such, Moothedath no longer holds an interest in a competing business (except to repay the loan

from Amboy Bank). There was no evidence presented why this avenue of resolution was not pursued.

Sixth, apparently Dunkin seeks termination of these two franchises as a means of deterrence to prevent other franchisees from violating covenants not to compete. The deterrent effect is satisfied through the termination of the Freehold Mall franchise, since it clearly satisfied the deterrence perspective.

Seventh, CWAIN and C3WAIN are minority owned franchisees who have succeeded on the hard work of Moothedath and Raji, to a lesser extend. It seems unreasonable to crush the two successful small business franchises by virtue of several misrepresentations when the termination of one is sufficient.

Eighth, there are actually other less onerous remedies that may be implemented. They are: (a) since only Baskin products are at issue, potentially the termination of the Baskin line of products at the Wilson Avenue location is sufficient; (b) if termination of all three businesses is the only appropriate solution, then a long term dissolution plan, as opposed to immediate termination that Dunkin proposes, should be developed wherein Moothedath may convey his interest to a third party, hopefully at a price closer to market rate rather than at a fire sale; and (c) payment of legal fees and costs.[10]

---

[10] Finally, Defendants set forth a counterclaim, which asserts that Dunkin's termination of the Franchise Agreements violated the New Jersey Franchise Practice Act (NJFPA); it is without merit. The NJFPA offers no relief under these circumstances. *See Liberty Sales Assocs., Inc. v. Dow Corning Corp.*, 816 F. Supp. 1004, 1008 (D.N.J. 1993). The NJFPA proscribes franchisors from terminating "a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination." N.J.S.A. § 56:10-5. Such a notice was provided. *See* Ex. P7. Moreover, in this case Moothedath defrauded Dunkin, nothing in the NJFPA protects against fraudulent conduct of a franchisee.

In conclusion, the Court finds that Dunkin's application to immediately terminate all three franchises is denied. The Court concludes the immediate termination of the Freehold Mall Franchise Agreement plus reasonable fees and cost, approved by the Court, is a fair and just remedy.

## ORDER AND JUDGMENT

It is on this __28__ day of __Aug__, 2018

ORDERED and adjudged that the application to immediately terminate the Wilson Avenue and Gordon Corner franchises is denied; and it is further

ORDERED and adjudged that the immediate termination of the Freehold Mall Franchise Agreement is granted; and it is further

ORDERED and adjudged that C3Wain and Wain shall reimburse Dunkin reasonable legal fees and cost as approved by the Court.


PETER G. SHERIDAN, U.S.D.J